# Supreme Court of Texas

---

No. 21-1045

---

Texas Department of State Health Services; John Hellerstedt, in His Official Capacity as Commissioner of the Texas DSHS,

*Appellants*,

v.

Crown Distributing LLC; America Juice Co., LLC; Custom Botanical Dispensary, LLC; 1937 Apothecary, LLC,

*Appellees*

---

On Direct Appeal from the
345th District Court of Travis County, Texas

---

**Argued March 22, 2022**

JUSTICE BOYD delivered the opinion of the Court.

JUSTICE YOUNG filed a concurring opinion, in which Chief Justice Hecht, Justice Devine, and Justice Blacklock joined.

The Texas Constitution guarantees that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." TEX. CONST. art. I, § 19. The plaintiffs in this case assert that this guarantee invalidates a new Texas law that prohibits the processing and

manufacturing of smokable hemp products. The trial court agreed and permanently enjoined the defendants from enforcing the challenged law, and the defendants directly appealed to this Court.[1] Because we conclude that the due-course clause does not protect the interest the plaintiffs assert, we reverse the trial court's judgment.

## I.
## Background

The federal Agriculture Improvement Act of 2018[2]—commonly referred to as the 2018 Farm Bill—classified "hemp" as an agricultural product and generally authorized each state to decide whether and how to regulate it within the state's borders. The bill delegated to the U.S. Department of Agriculture the responsibility for approving each state's hemp-regulation plan and for implementing a federal plan for any state that elects not to adopt its own. Although "marihuana" remains a Schedule 1 substance under the federal Controlled Substances Act, the 2018 Farm Bill excludes "hemp" and hemp products that are cultivated, produced, manufactured, and sold in compliance with federal regulations and the relevant state's federally approved plan.[3]

---

[1] *See* TEX. GOV'T CODE § 22.001(c) ("An appeal may be taken directly to the supreme court from an order of a trial court granting or denying an interlocutory or permanent injunction on the ground of the constitutionality of a statute of this state.").

[2] Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490 (2018).

[3] *See* 21 U.S.C. §§ 802(16)(B)(i) (defining "marihuana" to exclude "hemp"), 812 Schedule 1(c)(10) (listing "[m]arihuana" as Schedule 1 substance); 7 U.S.C. § 1639o(1) (defining "hemp"); 7 C.F.R. §§ 990.2–.20; 84 Fed. Reg. 58, 522–63; *see also generally* Meina Heydari, *The Budding Hemp Industry: The Effect of Texas House Bill 1325 on Employment Drug Policies*, 15 HEALTH L. &

The Texas Legislature adopted a hemp plan at its next legislative session in 2019. Through House Bill 1325,[4] the legislature enacted chapters 121 and 122 of the Texas Agriculture Code, generally permitting and regulating the cultivation and handling of hemp within the state. TEX. AGRIC. CODE §§ 121.001–122.404. The bill also added chapter 443 to the Texas Health and Safety Code, generally permitting and regulating the manufacture and sale of consumable hemp products within the state. TEX. HEALTH & SAFETY CODE §§ 443.001–.207. Chapter 443 expressly authorizes the executive commissioner of the Texas Health and Human Services Commission to "adopt rules and procedures necessary to administer and enforce this chapter," consistent with the state plan. *Id.* § 443.051.[5]

The Texas hemp plan generally permits Texans to cultivate, handle, transport, export, process, manufacture, distribute, sell, and purchase hemp and hemp-containing products within the state.[6] But as

---

POL'Y BRIEF 1, 11 (2020); David V. Patton, *A History of United States Cannabis Law*, 34 J.L. & HEALTH 1, 20 n.119 (2020); Lynn Garcia & Peter Stout, *Hemp or Marijuana? The Importance of Accurate and Reliable Forensic Analysis to the Fair Administration of Justice*, JUDGES' J., Winter 2021, at 22.

[4] Act of May 22, 2019, 86th Leg., R.S., ch. 764, 2019 Tex. Gen. Laws 2085.

[5] Chapters 121, 122, and 443 are expressly interrelated: chapter 443 requires the commissioner's rules and procedures to be consistent with "an approved state plan submitted" under chapter 121, TEX. HEALTH & SAFETY CODE § 443.051(1), and chapter 121 in turn requires the state plan to comply with chapters 122 and 443, TEX. AGRIC. CODE § 121.003(2), (3).

[6] The plan imposes various restrictions and limitations and requires a license or registration for some hemp-related activities. *See* TEX. AGRIC. CODE §§ 122.101(a) (permitting license holders to "cultivate" and "handle" hemp within the state and "transport" hemp outside the state), .301(a) (permitting

an exception to this otherwise broad authorization, the plan expressly prohibits the "processing" or "manufacturing" of hemp-containing products "for smoking."[7] Specifically, chapter 122 prohibits any state agency from authorizing "a person to manufacture a product containing hemp for smoking." TEX. AGRIC. CODE § 122.301(b). And chapter 443 requires the commissioner's rules to reflect the "principle" that "the processing or manufacturing of a consumable hemp product for smoking is prohibited." TEX. HEALTH & SAFETY CODE § 443.204(4). Based on this mandate, the commissioner adopted rule 300.104, which prohibits the "manufacture" and "processing" of "consumable hemp products for smoking." 25 TEX. ADMIN. CODE § 300.104.[8]

_____

manufacture of nonconsumable hemp products), .302(a) (permitting possession, transport, sale, and purchase of legally produced nonconsumable hemp products within the state), .303 (generally permitting retail sale of nonconsumable hemp products legally cultivated and manufactured outside of the state), .304 (generally permitting transport and export of nonconsumable hemp products across state lines); TEX. HEALTH & SAFETY CODE §§ 443.101 (permitting license holders to "process" and "manufacture" consumable hemp and hemp products within the state), .201 (permitting possession, transport, sale, and purchase of legally processed or manufactured consumable hemp products), .2025(b) (permitting sale of consumable hemp products by registered persons), .205(a) (permitting distribution of properly labeled consumable hemp products), .206 (generally permitting retail sale of consumable hemp products legally processed and manufactured outside of the state), .207 (permitting transport and export of consumable hemp products across state lines).

[7] The bill defines "smoking" to mean "burning or igniting a substance and inhaling the smoke or heating a substance and inhaling the resulting vapor or aerosol." TEX. HEALTH & SAFETY CODE § 443.001(11).

[8] The rule also prohibits the "distribution[] or retail sale of consumable hemp products for smoking." 25 TEX. ADMIN. CODE § 300.104. The plaintiffs challenged these two restrictions not only on constitutional due-course grounds, but also on the ground that these restrictions exceed the commissioner's statutory authority because the statutes only prohibit (and

The plaintiffs in this case (collectively, the Hemp Companies) are Texas-based entities that manufacture, process, distribute, and sell hemp products—including smokable hemp products—in Texas.[9] They filed this suit against the Texas Department of State Health Services and its commissioner (collectively, the Department), seeking a declaration that section 443.204(4) and rule 300.104 violate the Texas Constitution's due-course clause and an injunction prohibiting their enforcement.[10] After initially granting a temporary injunction against

only authorize the rules to prohibit) the "processing" and "manufacture" of such products. The commissioner initially opposed that argument but has now withdrawn that opposition in this Court. Thus, that portion of the trial court's judgment enjoining the rule's prohibition against the "distribution" or "retail sale" of such products is not before us.

[9] Crown Distributing, LLC is a Texas-based distributor (and previously a manufacturer) of hemp products, including smokable hemp products like hemp cigarillos, hemp flower, hemp pre-rolls, and hemp wraps and rolling paper. Wild Hempettes LLC is a Texas-based affiliate of Crown that assumed Crown's manufacturing business and now manufactures smokable hemp products. America Juice Co., LLC is a Texas-based affiliate of Crown that also manufactures and distributes consumable hemp products, including smokable hemp products. Custom Botanical Dispensary, LLC is a Texas-based retail store that sells a variety of hemp products, including smokable hemp products and raw hemp flower. 1937 Apothecary, LLC is a Texas-based affiliate of Custom Botanical that manufactures topical, ingestible, and smokable hemp products.

[10] The Hemp Companies initially challenged section 122.301(b) on the same due-course grounds but later dropped that challenge after the Department argued that section 122.301(b) does not apply to the Hemp Companies because it applies only to the manufacture of *nonconsumable* hemp products. As a result, the trial court's final judgment did not address or enjoin the enforcement of section 122.301(b). The Department now argues in this Court that section 122.301(b) in fact does apply to the Hemp Companies and that they lack standing to pursue their claims because their alleged injury is not "redressable" in light of their failure to challenge the constitutionality of that section. *See Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 485 (Tex.

5

the rule's enforcement,[11] the trial court rendered a final judgment declaring that section 443.204(4) violates the Texas Constitution and that rule 300.104 is invalid in its entirety and enjoining the Department

2018) (explaining that a plaintiff lacks standing to pursue injunctive relief if the injunction "could not possibly remedy his situation" (quoting *Heckman v. Williamson County*, 369 S.W.3d 137, 155 (Tex. 2012))). According to the Department, the Hemp Companies lack standing because, even if we were to affirm the trial court's judgment enjoining enforcement of section 443.204(4) and rule 300.104, section 122.301(b) would still prohibit the Department from authorizing the Hemp Companies "to manufacture a product containing hemp for smoking."

But a court's ability to affect "the behavior of the defendant towards the plaintiff" and even "'to effectuate a partial remedy' satisfies the redressability requirement." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) (quoting *Hewitt v. Helms*, 482 U.S. 755, 761 (1987); *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)). Because the final judgment here enjoins the Department from enforcing section 443.204(4) and rule 300.104, the Department cannot prohibit the Hemp Companies from manufacturing or processing consumable hemp products for smoking. *See* 25 TEX. ADMIN. CODE § 300.104. To the extent section 122.301(b) remains enforceable after the trial court's judgment, such that the Department "may not *authorize a person* to manufacture a product containing hemp for smoking," TEX. AGRIC. CODE § 122.301(b) (emphasis added), the final judgment nevertheless enjoins the State from *prohibiting the Hemp Companies* from manufacturing or processing consumable hemp products for smoking. The judgment thus provides the Hemp Companies with at least "a partial remedy" sufficient to sustain their standing.

[11] Although the Hemp Companies sought a temporary injunction against enforcement of both statutory sections and the rule, the trial court granted the injunction only against enforcement of the rule. The Department appealed that order, and the court of appeals affirmed the injunction only against enforcement of the rule's prohibition of the "distribution" and "retail sale" of smokable hemp products. *Tex. Dep't of State Health Servs. v. Crown Distrib.*, No. 03-20-00463-CV, 2021 WL 3411551, at \*8 (Tex. App.—Austin Aug. 8, 2021, no pet.) (mem. op.). The Hemp Companies have since been selling smokable hemp in Texas under the injunction's protection.

from enforcing the statute or the rule. We accepted the Department's direct appeal.

## II.
## Due Course of Law

The Hemp Companies assert that the state's ban against the manufacturing and processing of smokable hemp products in Texas violates the Constitution's due-course clause because the ban has no rational connection to any possible governmental interest[12] and its real-world effect is so burdensome as to be oppressive in light of any governmental interest.[13] They rely in particular on our decision in *Patel*

---

[12] To the extent, for example, that the ban is intended to reduce negative health effects or other harmful consequences resulting from the *use* of smokable hemp products, the Hemp Companies contend that the ban against in-state *manufacturing* or *processing* of such products does nothing to promote that purpose, particularly when the state's hemp plan freely permits the importation, distribution, sale, possession, and use of smokable hemp products within the state. And to the extent the ban is intended to minimize the difficulties law enforcement might have in distinguishing smokable hemp from smokable marijuana (which remains illegal in Texas), the ban does nothing to promote that purpose for the same reason: banning only the in-state *manufacturing* or *processing* of such products will not reduce the *use* of such products within the state. By analogy, the Hemp Companies contend that banning the in-state production of smokable hemp is as irrational as banning the in-state production of beef: the ban might force beef processors to move out of Texas and import their products into the state, but Texans would still sell, buy, and eat just as much beef. For the reasons explained below, we do not pass judgment on this no-rational-basis argument.

[13] The Hemp Companies submitted evidence, for example, that smokable hemp products are by far the most expensive and popular of all consumable hemp products, and the inability to manufacture and process them in Texas would cause the Hemp Companies to lose many millions of dollars in profits. And although they could (and, indeed, have already taken steps to) move their operations across the state line into Oklahoma, that transition would also cost them millions of dollars and cause dozens of Texas employees

7

*v. Texas Department of Licensing and Regulation*, 469 S.W.3d 69, 90 (Tex. 2015) (holding that state licensing requirements for commercial eyebrow threading were "so burdensome that they are oppressive").

Before we can address the Hemp Companies' no-rational-basis and oppressiveness arguments, however, we must determine whether the Hemp Companies have alleged the deprivation of an interest the due-course clause protects. *See Honors Acad., Inc. v. Tex. Educ. Agency*, 555 S.W.3d 54, 61 (Tex. 2018) ("Before any substantive or procedural due-process rights attach, however, the citizen must have a liberty or property interest that is entitled to constitutional protection.").[14] The Department argued in the trial court and continues to argue in this Court that the due-course clause does not protect the Hemp Companies' interest in manufacturing or processing smokable hemp products. Under our "two-step inquiry," we address this argument first. *Tex. S. Univ. v. Villareal*, 620 S.W.3d 899, 905 (Tex. 2021).[15] Because we agree

---

to lose their Texas jobs. For the reasons explained below, we do not pass judgment on the Hemp Companies' oppressiveness argument.

[14] *See also Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 15 (Tex. 2015) ("Before any substantive or procedural due-process rights attach, however, the Petitioners must have a liberty or property interest that is entitled to constitutional protection."); *Spring Branch I.S.D. v. Stamos*, 695 S.W.2d 556, 560 (Tex. 1985) ("[T]he strictures of due process apply only to the threatened deprivation of liberty and property interests deserving the protection of the federal and state constitutions.").

[15] *See Mosley v. Tex. Health & Hum. Servs. Comm'n*, 593 S.W.3d 250, 264 (Tex. 2019) ("A two-part test governs a due-process claim: we must determine whether petitioners '(1) ha[ve] a liberty or property interest that is entitled to procedural due process protection; and (2) if so, we must determine what process is due.'" (quoting *Univ. of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995))); *see also Logan v. Zimmerman Brush Co.*, 455

8

with the Department that the due-course clause does not protect the Hemp Companies' asserted interest, we do not reach the inquiry's second step.[16]

## A.  Work-related interests

The Hemp Companies assert that the state's ban on the manufacturing and processing of smokable hemp products impermissibly infringes on their "liberty" and "property" rights to "work and earn a living." This Court and the U.S. Supreme Court have at times recognized that the due-course and due-process clauses can protect work-related economic interests, which have sometimes been characterized as the "right to earn a living," *Smith v. Decker*, 312 S.W.2d 632, 633 (Tex. 1958), or the right to engage in a "chosen profession," *Greene v. McElroy*, 360 U.S. 474, 492 (1959).

---

U.S. 422, 428 (1982) ("[W]e are faced with what has become a familiar two-part inquiry: we must determine whether Logan was deprived of a protected interest, and, if so, what process was his due."); *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972) ("The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property.").

[16] We did not address the first-step issue in *Patel* because the defendants in that case did not argue that the plaintiffs failed to assert a protected interest. Instead, they filed a summary-judgment motion in which they *assumed* for purposes of the motion "that the [eyebrow threaders] had a protected, but not fundamental, liberty interest" and focused their arguments only on the second-step issue. *See Patel v. Tex. Dep't of Licensing & Regul.*, 464 S.W.3d 369, 381 n.12 (Tex. App.—Austin 2012), *rev'd*, 469 S.W.3d 69 (Tex. 2015). Because the trial court granted the motion and the court of appeals affirmed, the parties never presented to this Court the issue of whether the eyebrow threaders asserted a protected interest. As a result, we referred in *Patel* only generally to the eyebrow threaders' "economic interests," *Patel*, 469 S.W.3d at 75, 86, which they claimed were affected by "economic legislation" or "economic regulation statutes," *id.* at 80, 87.

But protected work-related interests, although sometimes broadly stated, are not without limits. Neither "property rights nor contract rights are absolute," and "[c]ertain kinds of business may be prohibited" altogether. *Nebbia v. New York*, 291 U.S. 502, 523, 528 (1934) (footnotes omitted).[17] The due-course clause is not so broad as to protect *every* form and method in which one may choose to work or earn a living, and some work-related interests do not enjoy constitutional protection at all. Many cases have thus described the constitutionally protected work-related interest more narrowly as a right to "engage in any of the *common* occupations of life," *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (emphasis added),[18] or as a right to follow or pursue a "*lawful* calling, business, or profession," *Dent v. West Virginia*, 129 U.S. 114, 121 (1889) (emphasis added).[19]

---

[17] *See, e.g.*, *Baccus v. Louisiana*, 232 U.S. 334, 337–38 (1914) (affirming that states may, "without violating the equal protection or due process of law clause of the 14th Amendment, . . . forbid the sale by itinerant venders of 'any drug, nostrum, ointment, or application of any kind'"). Because the U.S. Constitution's "due process" clause uses language similar to the Texas Constitution's "due course" clause, we may find guidance in the federal courts' due-process decisions. *Villarreal*, 620 S.W.3d at 905.

[18] *See also Mosley*, 593 S.W.3d at 264; *Than*, 901 S.W.2d at 929–30 (quoting *Roth*, 408 U.S. at 572); *Roth*, 408 U.S. at 572 (quoting *Meyer*, 262 U.S. at 399); *Truax v. Raich*, 239 U.S. 33, 41 (1915) (referring to the "right to work for a living in the *common* occupations of the community") (emphasis added)).

[19] The Hemp Companies assert that the due-course clause protects— and that section 433.204(4) and rule 300.104 violate—their "substantive" work-related rights, but they do not argue that the section or rule deprives them of the clause's "procedural" protections. Our concurring colleagues suggest that we should reconsider in some future case whether the Texas Constitution's due-course clause guarantees anything other than procedural protections. *See post* at ___ (YOUNG, J., concurring). Because the Department

10

To decide this case, we need not determine precisely what constitutes a "common occupation" or a "lawful calling." Nor must we decide how or whether Texas's due-course clause protects all such occupations or callings. It is enough to observe that the due-course clause, like its federal counterpart, has never been interpreted to protect a right to work in fields our society has long deemed "inherently vicious and harmful." *Murphy v. California*, 225 U.S. 623, 628, 630 (1912) (stating that such occupations are "neither protected by the state nor the Federal Constitution"). Historically, for example, gambling and racetrack ownership were not "one of life's 'common occupations,'" and the desire to make a living by owning such an enterprise does not fall within the "liberty" or "property" interests the due-process and due-course clauses protect. *Medina v. Rudman*, 545 F.2d 244, 251 (1st Cir. 1976) (explaining that an "investment in such an enterprise, when permitted at all, is plainly open to the strictest kind of supervision"). Citizens are "bound to know" that such occupations can "lawfully be regulated out of existence." *Murphy*, 225 U.S. at 630 (rejecting

has not raised this argument or otherwise urged us to reconsider our precedent on that issue, we do not address or take any position on it here.

By the same token, because the Hemp Companies have not asserted that the section or rule deprives them of any procedural rights, we do not address whether or how the due-course clause might provide procedural protections in connection with their asserted interest. We hold that the Hemp Companies have not alleged a liberty or property interest to which the due-course clause affords substantive protection, but we do not address whether or how the clause might procedurally protect related liberty or property interests. *See Villarreal*, 620 S.W.3d at 908–10 (assuming due-course clause provided procedural protections against the deprivation of a student's interest in completing a graduate education while concluding it provided no "substantive protection" for that interest).

11

constitutional challenge to an ordinance prohibiting "the keeping of billiard or pool tables for hire").

Similarly, some occupational interests exist only because the government has created them or made them available. For due-process and due-course purposes, such an interest is properly characterized as a form of "property" interest. *Villareal*, 620 S.W.3d at 908.[20] But to be constitutionally protected, a property interest must be "vested." *Honors Acad.*, 555 S.W.3d at 61. When an interest "is predicated upon the anticipated continuance" of an existing law and is "subordinate to" the legislature's right to change the law and "abolish" the interest, the interest is not vested. *City of Dallas v. Trammell*, 101 S.W.2d 1009, 1013 (Tex. 1937), *superseded on other grounds by constitutional amendment as stated in Degan v. Bd. of Trs. of Dall. Police & Fire Pension Sys.*, 594 S.W.3d 309, 313–14 (Tex. 2020).

So, for example, because the right to operate a charter school "rests entirely on the Legislature's decision to continue the [charter-school] system," a charter-school operator has no vested property interest in its charter. *Honors Acad.*, 555 S.W.3d at 62–63. Similarly, a government-issued permit to operate a private club that sells alcohol "is not a vested property right but is a privilege that is granted and enjoyed subject to regulations prescribed by the Legislature." *Tex. Liquor Control Bd. v. Canyon Creek Land Corp.*, 456 S.W.2d 891, 895 (Tex.

---

[20] A "liberty interest," by contrast, "may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).

1970).[21] As "a general rule," constitutional due-process protections do not "extend" to such privileges. *House of Tobacco v. Calvert*, 394 S.W.2d 654, 656–57 (Tex. 1965).[22]

## B.    The Hemp Companies' asserted interest

The Hemp Companies have described their interest in various ways. Most broadly, they have asserted a right to "economic liberty" and a "freedom to work and earn a living." Less broadly, they have described a "right to pursue a lawful calling" and "to engage in any of the common occupations of life." More narrowly, they have complained that Texas law deprives them "of the ability to manufacture in Texas a product that is lawful"; most narrowly, to engage in "the manufacture and processing of smokable hemp products from exempt portions of the cannabis plant." The Department focuses on the narrowest description, asserting that the "Hemp Companies have neither a liberty interest nor a vested property interest in manufacturing or processing consumable hemp products for smoking."

In some sense, all of these descriptions—the most general and the most specific, as well as those falling between the two—accurately

---

[21] *See also Tex. Dep't of Motor Vehicles v. Fry Auto Servs.*, 584 S.W.3d 138, 143–44 (Tex. App.—Austin 2018, no pet.) ("Appellees' 'lawful calling,' unlike that protected in *Patel*, is wholly a creation of the government. As such, it does not fall under the shield of economic liberty addressed in *Patel*."); *Limon v. State*, 947 S.W.2d 620, 626 (Tex. App.—Austin 1997, no writ) ("Because an alcoholic beverage permit is merely a privilege, applicants do not have a constitutionally protected interest in obtaining it and are not entitled to due process of law.").

[22] Once granted, a privilege that cannot be taken away except for good cause may rise to the level of a vested property right that the due-process and due-course clauses protect. *House of Tobacco*, 394 S.W.2d at 657.

13

identify the interest the Hemp Companies are asserting.[23] We have not directly addressed the question of how generally or specifically courts should define asserted constitutional interests, but we need not fully resolve that question here. It is enough for present purposes to conclude that we should define the interest as specifically as necessary to accurately reflect the constitution's language ("liberty" and "property"), our precedential construction of that language, and the realities of the deprivation the Hemp Companies are claiming.

Defining the interest in this case broadly, as a "right to economic freedom" or a right to "make a living" or to "engage in an occupation of one's choosing," might sufficiently fit within the due-course clause's broad references to "liberty" or "property," but it would not reflect the well-established precedent recognizing those interests' limitations to "*common* occupations" and "*lawful* callings," which exclude an interest in an "inherently harmful and vicious" economic endeavor, or a right that is not vested. Nor do the broad characterizations accurately reflect the realities of the deprivation the Hemp Companies assert. They do not

---

[23] *See* Randy E. Barnett, *Scrutiny Land*, 106 MICH. L. REV. 1479, 1489–90 (2008) (describing how the plaintiff in *Raich v. Gonzales*, 500 F.3d 850, 863 (9th Cir. 2007), claimed a right to "preserve her life" by using marijuana, while the government defined the interest as "the right to obtain and use marijuana," and contending that the "dirty little secret of constitutional law is that, purely as a descriptive matter, they were both correct"); Marc P. Florman, *The Harmless Pursuit of Happiness: Why "Rational Basis with Bite" Review Makes Sense for Challenges to Occupational Licenses*, 58 LOY. L. REV. 721, 740 (2012) (discussing *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir.), *cert. denied*, 571 U.S. 952 (2013), and asserting that "[o]ne could just as accurately define the right the monks are attempting to assert in broad terms (economic freedom or liberty of contract), in narrow terms (the right to sell wooden caskets), and in terms somewhere in between (e.g., the right to work in one's chosen profession without unnecessary regulation)").

contend generally that the state's hemp plan unconstitutionally restricts their right to make a living or even to do so by manufacturing hemp products. In fact, they concede that, even with the prohibition against the production of smokable hemp products, Texas law permits them to be lawfully engaged in the hemp-products industry, although not nearly as profitably. Instead, they narrowly challenge only the specific prohibition against the manufacture and processing of smokable hemp products. We therefore narrowly define their asserted interest accordingly and ask whether the right to engage in *that* economic endeavor enjoys the due-course clause's protection.

## C.     Production of smokable hemp products

The Hemp Companies argue that the due-course clause protects their asserted interest in a common and lawful occupation because, until the enactment of House Bill 1325, Texas law always permitted manufacturing and processing smokable hemp products. But in making that argument, the Hemp Companies conflate the substance defined as "hemp" under House Bill 1325 (that is, the substance the Companies want to use to manufacture and process smokable hemp products) and the substance commonly known as "hemp" throughout American history. To explain, we must conduct a fairly thorough review of the historical background leading up to the statutes now at issue.

15

### 1. Hemp, Cannabis, CBD, and THC

Initially, the term "hemp" was used generically to refer to a variety of fibrous plants.[24] After Carl Linnaeus classified the *Cannabis* genus of plants in 1753,[25] the term was used to refer to various species within that genus,[26] and ultimately more specifically to the species *Cannabis sativa L.*[27] Hemp—as the cannabis plant was commonly called—was a "staple crop" in the American colonies and used throughout early American history to produce a number of products including clothing and other textiles, rope, paper, and medicines.[28] After the cotton gin became more widely available in the early 1800s, however, the hemp industry began a steady decline.[29]

The *Cannabis sativa L.* plant naturally produces chemical compounds called cannabinoids.[30] One such cannabinoid is cannabidiol,

---

[24] *See* Ryan Golden, *Dazed & Confused: The State of Enforcement of Marijuana Offenses After the Texas Hemp Farming Act*, 72 BAYLOR L. REV. 737, 739 (2020).

[25] *See* Patton, *supra* note 3, at 4.

[26] *See Few v. State*, 588 S.W.2d 578, 581 (Tex. Crim. App. 1979) ("Cannabis sativa L. is the name bestowed on the Indian hemp plant by the Swedish botanist Carolus Linnaeus."); Golden, *supra* note 24, at 739.

[27] *See generally Capuano v. State*, No. 05-04-01832-CR, 2006 WL 321964, at *4 (Tex. App.—Dallas Feb. 13, 2006, no pet.); Patton, *supra* note 3, at 4.

[28] *See* Golden, *supra* note 24, at 739; Patton, *supra* note 3, at 3; *Marijuana: A Study of State Policies & Penalties*, Nat'l Governors' Conf. Ctr. for Pol'y Rsch. & Analysis (Nov. 1977) at 1, https://www.ojp.gov/pdffiles1/Digitization/43880NCJRS.pdf.

[29] *See Marijuana: A Study of State Policies & Penalties*, *supra* note 28, at 1.

[30] *See* Heydari, *supra* note 3, at 4–5.

commonly referred to as CBD.[31] CBD is credited by some with providing relief for a variety of ailments when consumed, including inflammation, neurodegenerative diseases, epilepsy, seizures, pain, anxiety, psychosis, depression, insomnia, acne, and drug addictions.[32] Importantly, CBD does not have psychoactive or psychotropic effects, and thus consuming CBD does not cause intoxication or produce a "high."[33]

The *Cannabis sativa L.* plant also produces another cannabinoid called Delta-9 tetrahydrocannabidiol, commonly referred to as THC.[34] THC may also provide relief for certain ailments, including nausea, spasms, appetite loss, and neuropathic pain.[35] But more famously, THC has a psychoactive effect that produces a high when ingested by humans.[36] Historically, certain anatomical parts of the *Cannabis sativa L.* plant naturally contained more THC than others. In particular, the leaves, buds, and flowers typically contained higher levels of THC, while the mature stalks and seeds contained much lower levels.[37]

---

[31] *See id.* at 5.

[32] *See id.* at 4–5; Robert M. Lydon, *High Anxiety: Forcing Medical Marijuana Patients to Choose Between Employment and Treatment*, 63 B.C. L. REV. 623, 625 n.12 (2022).

[33] *See* Patton, *supra* note 3, at 20 n.118; Heydari, *supra* note 3, at 4–5.

[34] *See Few*, 588 S.W.2d at 581; Lydon, *supra* note 32, at 625 n.12; Heydari, *supra* note 3, at 4–5.

[35] *See* Lydon, *supra* note 32, at 625 n.12; Heydari, *supra* note 3, at 4–5.

[36] *See Few*, 588 S.W.2d at 581; Lydon, *supra* note 32, at 625 n.12.

[37] *See* Golden, *supra* note 24, at 739; Garcia & Stout, *supra* note 3, at 22–23.

## 2. Government regulation and control

Within the United States, the use of the *Cannabis sativa L.* plant as an intoxicant developed initially along the Gulf Coast and the Rio Grande in the early 1900s.[38] Around the same time, Americans increasingly began referring to the plant by the name "marihuana" (or "marijuana"),[39] particularly when used—or when referring to the parts of the plant used—to produce a high.[40] The term "hemp" continued to be used within the context of industrial uses, but both terms—hemp and marihuana—referred to the same plant, the *Cannabis sativa L.*[41]

As use of the *Cannabis sativa L.* plant as an intoxicant gained in popularity, government efforts to control, restrict, or prohibit that use quickly followed. By 1915, the City of El Paso adopted one of the country's first municipal ordinances banning the sale and possession of cannabis.[42] Soon thereafter, Congress passed the Narcotic Drug Import and Export Act of 1922, prohibiting the importation, exportation, and

---

[38] Patton, *supra* note 3, at 5–6; *Marijuana: A Study of State Policies & Penalties*, *supra* note 28, at 2.

[39] "'Marihuana,' with an 'H,' is the traditional spelling in the United States, particularly in official, government documents. 'Marijuana,' with a 'J,' is the popular, contemporary spelling." Patton, *supra* note 3, at 3 (footnote omitted).

[40] Julie Andersen Hill, *Cannabis Banking: What Marijuana Can Learn from Hemp*, 101 B.U. L. REV. 1043, 1046 n.7 (2021); Golden, *supra* note 24, at 739.

[41] Hill, *supra* note 40, at 1046 n.7; Golden, *supra* note 24, at 739.

[42] Patton, *supra* note 3, at 6.

non-medical use of opiates and narcotics and establishing the Federal Narcotics Control Board.[43]

Although commentators may debate whether Congress intended the 1922 Act to include cannabis among the regulated "narcotics,"[44] regulatory efforts in the 1930s undeniably focused on the *Cannabis sativa L.* plant. By 1931, twenty-nine states—including Texas—had passed laws prohibiting "marihuana" use.[45] By the mid-1930s, the Texas Legislature had enacted a series of statutes making it illegal to sell, distribute, or possess narcotics, which was defined to include "marihuana," and Texas courts were deciding cases filed under those statutes, even if they weren't sure what marihuana was.[46]

Congress's next step was to enact the Marihuana Tax Act of 1937.[47] The 1937 Act did not directly outlaw marihuana, but instead imposed such demanding tax and administrative burdens on those who

---

[43] *Id.* at 7.

[44] *Id.* (suggesting that the term "'narcotic' was understood to mean any drug used by individuals of low socio-economic standing" and thus "cannabis was classified as a narcotic" (citing Richard J. Bonnie & Charles H. Whitebread II, THE MARIJUANA CONVICTION: A HISTORY OF MARIJUANA PROHIBITION IN THE UNITED STATES 51 (1974))).

[45] *Marijuana: A Study of State Policies & Penalties*, *supra* note 28, at 2.

[46] *See Spangler v. State*, 117 S.W.2d 63, 64 (Tex. Crim. App. 1938); *Baker v. State*, 58 S.W.2d 534, 534 (Tex. Crim. App. 1933) (relying on a magazine's description of "marihuana" and noting that "the accuracy of the statement is not vouched for by the members of the court"); *Santos v. State*, 53 S.W.2d 609, 609 (Tex. Crim. App. 1932); *Davila v. State*, 298 S.W. 908, 908 (Tex. Crim. App. 1927) (reversing conviction for selling "Marijuana, which seems to be a preparation used in a pipe or cigarette to smoke").

[47] Marihuana Tax Act of 1937, Pub. L. No. 75-238, 50 Stat. 551 (1937) (repealed 1970); *see* Patton, *supra* note 3, at 9.

distributed, sold, or possessed it that it "practically curtailed the marijuana trade."[48] As the first federal law directed specifically at curtailing the use of cannabis, the Act defined the term "marihuana" to mean "all parts of the plant *Cannabis sativa L.*, whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds, or resins." Marihuana Tax Act of 1937, Pub. L. No. 75-238, sec. 1(b), 50 Stat. 551, 551 (1937) (repealed 1970). Based, however, on the common understanding that some of the plant's parts did not contain any (or much) of the intoxicating ingredient, the definition expressly excluded from the term "the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination." *Id.*

By the end of 1937, forty-six of the forty-eight states and the District of Columbia had enacted legislation prohibiting the possession and use of marihuana.[49] Nevertheless, concerns over the significantly increasing usage of illegal drugs led Congress to pass the Boggs Act of 1951, substantially increasing the penalties for violations of the Narcotic Drug Import and Export Act of 1922 and the Marihuana Tax Act of

---

[48] *Gonzales v. Raich*, 545 U.S. 1, 11 (2005); *see* Heydari, *supra* note 3, at 4–5.

[49] *See Marijuana: A Study of State Policies & Penalties*, *supra* note 28, at 4.

20

1937.[50] Even further increases resulted from the passage of the Narcotic Control Drug Act of 1956, which included cannabis among the list of drugs to which it applied.[51] Thirty-four states, including Texas, followed suit by enacting "Little Boggs Acts," increasing the penalties under their state drug laws.[52]

The 1960s famously produced a substantial surge in marihuana use.[53] In 1970, as part of President Nixon's "War on Drugs," Congress passed the Comprehensive Drug Abuse Prevention and Control Act and the Controlled Substances Act, categorizing "marihuana" as a Schedule 1 drug, having the highest potential for abuse and no accepted medical use.[54] "Cannabis has remained a Schedule I drug ever since."[55]

Like the Marihuana Tax Act of 1937, the federal Controlled Substances Act defined "marihuana" anatomically to mean "all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its

---

[50] *See id.* at 4–5; Patton, *supra* note 3, at 9.

[51] *See Marijuana: A Study of State Policies & Penalties*, *supra* note 28, at 5.

[52] *See* Patton, *supra* note 3, at 12 & n.79.

[53] *See Marijuana: A Study of State Policies & Penalties*, *supra* note 28, at 5.

[54] Controlled Substances Act of 1970, Pub. L. No. 91-513, 84 Stat. 1236 (1970) (codified at 21 U.S.C. § 801); *see Gonzales*, 545 U.S. at 13–14; Patton, *supra* note 3, at 15.

[55] Patton, *supra* note 3, at 18.

seeds or resin." 21 U.S.C. § 802(16)(A).[56] But also like the 1937 Act, the definition excluded "the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination." *Id.* § 802(16)(B)(ii).

Because the Controlled Substances Act completely prohibited substances containing any amount of THC, the federal Drug Enforcement Agency interpreted the law as banning all forms of the *Cannabis sativa L.* plant, whether considered "hemp" or "marihuana."[57] As a result, the federal government "prohibited all forms of cannabis pursuant to the [Controlled Substances Act] until the passage of the 2018 Farm Bill," nearly fifty years later.[58] When Texas enacted its own Controlled Substances Act in 1973, it "carried forward" the same definition from the federal law. *Williams*, 524 S.W.2d at 710.[59]

---

[56] *See United States v. Moore*, 446 F.2d 448, 450 (3d Cir. 1971); *Williams v. State*, 524 S.W.2d 705, 708 n.1 (Tex. Crim. App. 1975).

[57] *See* Heydari, *supra* note 3, at 10.

[58] *Id.*

[59] *But see Few*, 588 S.W.2d at 582–83 (discussing differences between the federal Controlled Substances Act and the Texas Controlled Substances Act, particularly regarding their treatment of synthetic hallucinogenic substances, and observing that the Texas "Legislature greatly expanded what was the more restricted definition of tetrahydrocannabinols in the draft uniform act and the Federal law").

### 3. Decriminalization of cannabis

The move to decriminalize cannabis began to gain ground in the mid-1990s. From 1996 to 1998, California, Alaska, Oregon, and Washington revised their laws to allow the use of low-THC cannabis for medical purposes.[60] By 2008, ten states had passed such laws, and Texas followed suit in 2015. *See* TEX. OCC. CODE §§ 169.001–.005. In 2012, Colorado became the first state to legalize marihuana for recreational use.[61] By 2020, thirty-four states had permitted marihuana use for medical purposes and sixteen states and the District of Columbia had also permitted recreational use.[62] The federal Controlled Substances Act, however, continues to list marihuana as a Schedule 1 controlled substance. *See* 21 U.S.C. § 812 Schedule 1(c)(10).

### 4. Authorized usage of "hemp"

As mentioned, the federal Marihuana Tax Act and the federal and Texas Controlled Substances Acts, which regulated, taxed, and prohibited the possession and use of "marihuana," defined that term to mean "all parts of the plant *Cannabis sativa L.*," but excluded "the mature stalks" and seeds and various products made or derived from the stalks or seeds. *Id.* § 802(16); *see* TEX. HEALTH & SAFETY CODE § 481.002(26).[63] These excluded parts and products were "commonly

---

[60] Patton, *supra* note 3, at 19; Heydari, *supra* note 3, at 9.

[61] Heydari, *supra* note 3, at 9.

[62] *Id.*

[63] Nevertheless, under federal law as construed and enforced by the Drug Enforcement Agency, all CBD was considered to be "marijuana-derived, and therefore, illegal." Patton, *supra* note 3, at 20 n.119.

known as hemp," *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1085 (9th Cir. 2003), although the statutes did not refer to them by that name.

Congress began to change the legal landscape by passing the 2014 Farm Bill, which created a pilot program to allow more extensive production and use of the *Cannabis sativa L.* plant for industrial (or, at least, non-intoxicating) purposes, while still continuing to prohibit the possession and use of the plant in intoxicating forms.[64] Taking advantage of scientific advancements in cultivation and testing methods, the 2014 Farm Bill adopted a completely new approach to distinguishing between legal and illegal cannabis. Instead of defining "marihuana" anatomically as all parts of the *Cannabis sativa L.* plant except for the mature stalks and seed products, the 2014 Farm Bill defined it as all parts of the plant except for "hemp," and then defined hemp to mean all parts of the *Cannabis sativa L.* plant with a THC concentration of no more than 0.3 percent by dry weight. As a result, the statute distinguished between legal hemp and illegal marihuana based on its chemical concentration of the ingredient that produces a high, instead of on the anatomical parts that historically contained that ingredient in higher concentrations. The 2014 Farm Bill thus provided a real-world experiment allowing for "hemp" production while maintaining the longstanding prohibition against "marihuana."[65]

---

[64] Agricultural Act of 2014, Pub. L. No. 113-79, 128 Stat. 649, 912 (2014) (current version at 7 U.S.C. § 5940); *see* Patton, *supra* note 3, at 20 n.119.

[65] Heydari, *supra* note 3, at 10.

In 2018, Congress more broadly changed the landscape by passing the 2018 Farm Bill.[66] Like the 2014 Farm Bill, the 2018 bill defined "hemp" separately from "marihuana," referring in both definitions to the *Cannabis sativa L.* plant but distinguishing between the two based on the plant's or product's concentration of THC. The bill removed "hemp," as now defined, from federal controlled-substance schedules and provided instead for it to be regulated as an agricultural product. And as mentioned, the bill permitted each state to develop its own plan for developing the hemp industry within its borders, with federal approval.[67]

When Texas implemented its state hemp plan by passing House Bill 1325 the following year, it followed the federal approach to distinguishing between marihuana and hemp. Specifically, where the statutes previously defined "marihuana" to mean "the plant *Cannabis sativa L.*" and all of its parts and derivatives, except for its "mature stalks" and certain derivatives, House Bill 1325 added an exception listing "hemp, as that term is defined by Section 121.001, Agriculture Code." TEX. HEALTH & SAFETY CODE § 481.002(26). It also amended the Health and Safety Code's definition of "Controlled substance" to expressly exclude "hemp, as defined by Section 121.001, Agriculture Code, or the tetrahydrocannabinols in hemp." *Id.* § 481.002(5). And it added section 121.001 of the Agriculture Code to define "hemp" to mean "the plant Cannabis sativa L." and all of its parts and derivatives with

---

[66] Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490 (2018).

[67] *See* Garcia & Stout, *supra* note 3, at 22.

a THC concentration "of not more than 0.3 percent on a dry weight basis." TEX. AGRIC. CODE § 121.001.

As a result of these revisions, the *Cannabis sativa L.* plant and its parts and derivatives that historically were illegal—including the flowers, buds, leaves, and stems—can now be legally cultivated in Texas, so long as they contain a THC concentration of no more than 0.3 percent.[68] Under the new statutory framework, all such parts of the *Cannabis sativa L.* plant now qualify as "hemp," and no longer qualify as "marihuana." Farmers can produce hemp by controlling a plant's THC levels in a number of ways, including by selective breeding and by harvesting the plant before its THC concentration exceeds 0.3 percent.[69] But the only way to distinguish between a legal "hemp" plant, part, or product and an illegal "marihuana" plant, part, or product is to test its THC concentration forensically; they are "virtually indistinguishable by sight or smell alone."[70]

## D. Constitutional analysis

With this background in mind, we must determine whether the Texas Constitution's due-course clause protects the Hemp Companies'

---

[68] The 2018 Farm Bill did not completely legalize all plants and products that meet the new definition of "hemp." Beyond the maximum-THC-concentration requirement, the bill also imposes licensing, registration, reporting, testing, and other requirements. Cannabis remains a scheduled substance under the Controlled Substances Act, and plants and products that are cultivated, handled, manufactured, processed, distributed, or sold in violation of these additional requirements remain illegal. *See* Heydari, *supra* note 3, at 11.

[69] *See* Garcia & Stout, *supra* note 3, at 22–23.

[70] Golden, *supra* note 24, at 740; *see also* Garcia & Stout, *supra* note 3, at 22–23; Heydari, *supra* note 3, at 6.

asserted interest in manufacturing or processing smokable hemp products. The Department argues it does not because the Companies "are not complaining of economic regulations that burden their exercise of a 'lawful calling.'" Instead, the Department contends, the Hemp Companies are complaining about the inability to produce products "in contravention of the law"—products that Texans could not even legally possess until "a few years ago." According to the Department, the Companies have, at most, "a mere unilateral expectation" of being able to produce smokable hemp products and thus do not complain of the deprivation of a vested right.

By contrast, the Hemp Companies argue that they are asserting the deprivation of a protected interest because "the manufacture and processing of smokable hemp products from exempt portions of the cannabis plant was legal until § 443.204(4) was enacted." Noting that the Marihuana Tax Act of 1937 and the federal and Texas Controlled Substances Acts excluded "non-psychoactive portions of the cannabis plant"—"such as the mature stalks, seeds, fiber, and cannabis seed oil"—from the definition of "marihuana," the Companies assert that "the manufacture and sale of these hemp products has always been legal in the United States." Based on these assertions, the Companies contend that section 443.204(4) deprives them of a protected interest because it completely bans them from engaging in a business that has always been lawful and would still be lawful if it weren't for that section's prohibition. *See, e.g.*, *Smith*, 312 S.W.2d at 634 (holding that bail bondsmen had a "vested property right in making a living" by "performing their business otherwise lawful but for the statute in question").

27

We are not convinced. The Companies' argument conflates the substances that were not prohibited before House Bill 1325 with those that are not prohibited after. Even assuming arguendo that a different regulatory history might produce a different result, the actual history of governmental regulation of "hemp" undermines the Companies' claim. To the extent the manufacture and processing of smokable "hemp" products was legal before section 443.204(4), it was legal only if those products were made from the exempt parts of the cannabis plant—the mature stalks or oils from the stalks or seeds. Any product made from other parts of the plant—the flowers, buds, or leaves, for example—was considered to be marihuana and was completely illegal under prior law.

The record in this case establishes that the cannabis flower is the key and essential ingredient in the smokable products the Hemp Companies desire to process and manufacture. As one witness testified, "ultimately what we produce is a flower." To manufacture smokable hemp products, the Companies (1) take "raw hemp material" in "buck or shuck form, meaning that there's essentially the flower, the leaf, and occasionally some seed and stems," (2) "separate out the seeds and stems," (3) "grind" and "sift" the "flower and make sure it's the appropriate size," (4) "flavor the Hemp material," and then (5) manufacture "the rods of the smokable hemp product." As the Companies' counsel summarized the evidence in the trial court, "there is no difference between hemp flower and smokable hemp. They are the same thing . . . . There is no distinction between the two."

As explained, the law has long prohibited the manufacturing or processing of any smokable (or other) product using or containing the

28

flower of the *Cannabis sativa L.* plant. And as the Companies acknowledge, House Bill 1325 "established a new framework for the production, manufacture, retail sale, and inspection of hemp and hemp products." Under this new framework, all plants and parts that qualify as "hemp" are excepted, but those are not the same substances that were colloquially referred to as "hemp" under the old framework.

Nor are we convinced by the fact that the Companies began processing and manufacturing smokable hemp products after the 2018 Farm Bill but before section 443.204(4) became effective. The Companies assert that they began manufacturing smokable hemp products that contained zero percent THC in the fall of 2018, with the approval of (or at least without any objection from) the federal Drug Enforcement Agency and the Dallas Police Department. The Department contends that such sales were nevertheless illegal at that time because Texas did not remove "hemp" from the controlled-substances schedules until March 2019.[71] But in either event, we do not find the fact that the Companies may have "legally" manufactured smokable hemp products for a few (or even several) months before section 443.204(4) became effective in June 2019 relevant to our analysis. Even if there had been a few months during which the manufacture of smokable hemp was lawful, this brief window would have existed only by a temporary administrative quirk in the process of the substance's partial "decriminalization." Such a fleeting "right" was

---

[71] *See* Dep't of State Health Servs., *Order Removing Hemp, as Defined by the Agricultural Marketing Act of 1946, From Schedule I*, 44 Tex. Reg. 1467, 1467–69 (2019).

29

in no sense "vested" in the Companies, which had, at most, a mere anticipation that the government would allow a right it created to continue in existence. Nor would the uncertain state of the law for a few months transform the long-prohibited manufacture of smokable cannabis flower into the kind of "lawful calling" to which courts have afforded constitutional protection.

Ultimately, the Hemp Companies complain that Texas law does not permit them to manufacture or process products that Texas law prohibited for nearly a century. The legislature's recent decision to adopt a "new framework" that permits the possession and use of those products, and even allows the manufacture and processing of similar products, does not transform the Hemp Companies' desire to produce products that the law still prohibits them from producing into a constitutionally protected interest. Considering the long history of the state's extensive efforts to prohibit and regulate the production, possession, and use of the *Cannabis sativa L.* plant, we conclude that the manufacture and processing of smokable hemp products is neither a liberty interest nor a vested property interest the due-course clause protects. It is, instead, "purely a personal privilege" that the people's elected representatives in the legislature may grant or withdraw as they see fit. *State v. Bush*, 253 S.W.2d 269, 272–73 (Tex. 1952).

### III.
### Conclusion

We hold that the Hemp Companies' complaints regarding section 443.204(4) and rule 300.104 do not assert the deprivation of an interest substantively protected by the Texas Constitution's due-course clause. Because the Department no longer defends the portion of

30

rule 300.104 that prohibits the "distribution" and "retail sale" of consumable hemp products for smoking, the trial court's injunction against enforcement of that portion remains. We otherwise reverse the trial court's judgment and render judgment accordingly.

_____

Jeffrey S. Boyd
Justice

**OPINION DELIVERED:** June 24, 2022